JIM DEHOFF,                          )
                                     )
        Plaintiff/Counterclaim       )
        Defendant,                   )        **CIVIL ACTION**
                                     )
v.                                   )        No.  11-1052-MLB
                                     )
KANSAS AFL-CIO EMPLOYEE BENEFIT      )
PLAN AND TRUST,                      )
                                     )
        Defendant/Counterclaim       )
        Plaintiff,                   )
                                     )
and                                  )
                                     )
KANSAS AFL-CIO ASSOCIATION,          )
                                     )
        Counterclaim Plaintiff.      )
_____)

### MEMORANDUM DECISION

Plaintiff Jim DeHoff claims the Kansas AFL-CIO Employee Benefit Plan and Trust ("the Plan") unlawfully reduced his pension benefits in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. The Plan and its sponsor, the Kansas AFL-CIO Association, deny any violation and claim plaintiff is liable to the Plan for breaching fiduciary duties and for engaging in transactions prohibited by ERISA.

The dispute hinges on a 1997 amendment to the Plan that increased pension benefits for employees of the Kansas AFL-CIO Association (hereinafter "Employer"). It altered the benefit formula to effectively increase the maximum benefit from 70% of an employee's pay to 85%. Plaintiff, who was Employer's Executive Secretary-Treasurer as well as the Plan Administrator (in addition to being a

Plan participant), executed this amendment in Employer's name. The amendment was not discussed with or approved by Employer's Executive Board.

Nine years later – in 2006 – Plaintiff retired and began drawing a pension based on the 85% benefit formula.[1] In 2007, Employer advised plaintiff and other retired plan participants that the 1997 amendment was invalid and, as a result, their monthly pension benefit would be reduced to the level previously authorized by the Board. Employer's Executive Board formally amended the Plan in 2007 to affect this reduction. Plaintiff's pension was reduced from $3702 per month to $3026 per month.

The case was tried to the court on March 12-14, 2013. The following decision represents the court's findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a).

## I. Findings of Fact.

a. Stipulated Facts. (Doc. 55 at 2-3).

Employer is a not-for profit Corporation under Kansas law, with members rather than shareholders. The members elect an Executive Board, which is Employer's board of directors. Employer's rules of governance are contained in its Constitution and Bylaws.

The Plan, a defined benefit plan under ERISA, was adopted by Employer effective October 1, 1964. The Plan was subsequently amended

---

[1] With reductions for certain benefit elections, including early retirement and a spousal benefit, Plaintiff's benefit was actually less than 85% of his pay. For ease of reference, however, the court refers throughout this opinion to the unreduced maximum pension benefit available for an individual.

and/or restated at various times, including on October 1, 1984; October 1, 1989; October 1, 1994; October 1, 1997; October 1, 1999; October 1, 2002; and November 2007.

The validity of the October 1, 1997 Amendment and its benefit formula increase is at issue in this case, as is the 2002 Plan that incorporated the same benefit formula. The November 2007 amendment and its benefit reduction when compared to the 1997 Amendment is also at issue in this case.

During his employment with Employer, Plaintiff was the Plan Administrator in charge of administering the plan until his retirement on August 31, 2006.

The Plan benefit formula was increased in 1994 to 70% of pay for persons with 15 or more years of service with Employer.[2] The subsequent 1997 Amendment, if valid, increased benefits to 85% of pay for persons with 15 or more years of service.

Under the terms of the Plan, Employer had the right to amend the Plan.

On August 31, 2006, Plaintiff retired from Employer with more than 15 years of service and was entitled to a pension under the Plan.

By letter dated November 19, 2007, Employer advised Plaintiff

---

[2] The evidence is unclear with respect to this 70% figure. Prior to the 1994 amendment, the maximum benefit was 55% for persons with 15 or more years of service. In 1994 the Board adopted Plaintiff's proposal to increase the benefit "by ten percent." Assuming this meant an increase of ten percentage points in the benefit formula (i.e., from 55% to 65%), it is unclear why the 1994 amendment actually adopted a maximum of 70%. Plaintiff testified he simply signed off on the benefit formula drafted by Cooper and he does not know how or why Cooper put in a formula that added up to 70%. Be that as it may, the parties have stipulated that in 1994 the maximum benefit was increased to 70%.

and other Plan participants that the monthly benefit to be paid by the Plan would be reduced from the monthly benefit they had been receiving since their retirement. The letter said "irregularities" had been discovered consisting of some beneficiaries receiving enhanced pension benefits without approval from the Board of Directors. The letter said the Plan was underfunded and changes were necessary to reduce benefits to the level last approved by the Board of Directors.

b. <u>Facts shown at trial</u>.

The court finds the following facts from all of the evidence presented, including the credibility of the witnesses who testified in court or by deposition.

Plaintiff was born and raised in Lawrence, Kansas. After high school he attended a Plumbers and Pipefitters School and became an apprentice pipefitter/welder. He worked in construction for several years and became a journeyman welder. He was elected vice-president of the Plumbers and Pipefitters Local 763 Union and became its business manager, serving in that capacity for 13 years. Beginning in 1982, Plaintiff additionally served on the Executive Board of Directors of the Kansas AFL-CIO (Employer).

In 1986 Plaintiff accepted a full-time paid position with Employer in Topeka, Kansas, as its Executive Secretary-Treasurer. He remained in that position until his retirement in 2006.

<u>Employer's Structure</u>.

Employer typically had five or six employees at any given time. Its primary function was to lobby the Kansas legislature for laws favorable to organized labor and to recommend candidates for elective office who favor policies benefitting organized labor.

Employer's Constitution and Bylaws describe how Employer operates. (Pl. Exh. 1; Def. Ex. 401). Employer is composed of local and national unions with which Employer is affiliated. (Art. IV). These unions pay a per capita tax to be admitted as members. (Art. V). Employer's revenue comes from these taxes. As of 2006, each affiliated union paid Employer a monthly per capita tax of ninety cents on its members. Employer's Executive Board was responsible for setting aside funds from this revenue to be used for the political and other purposes of Employer, as well as funds to provide pension, health and other benefits for Employer's full-time employees. (Art. VI).

Employer was required to meet "in convention" every other year. (Art. VII). Each affiliated union was entitled to have delegates to the convention, with the number of delegates dependant upon each union's membership.

Employer had the following elective officers: a President, Executive Vice-President, Executive Secretary-Treasurer, and 21 Executive Board members. The election of officers was done by majority vote of delegates at the conventions. Board members were elected to 2-years terms; other officers were elected to 4-year terms.

Collectively the foregoing elective officers constituted Employer's Executive Board. The judicial and executive authority of Employer between conventions was vested in the Executive Board. (Art. XVI). The Board was required to meet at least two times per year and could call special meetings if necessary. It typically met two or three times per year.

The President's duties included presiding at all of meetings of Employer and its Executive Board, appointing all committees, calling

Board meetings, and transacting other related business. The President was to interpret the Constitution and Bylaws, with his interpretation binding unless changed by the Executive Board or Convention. (Art. XVII). This was a non-paying position, and the President typically had little involvement in matters outside of Board meetings and conventions.

Plaintiff, as Executive Secretary-Treasurer, was Employer's full-time executive officer. His duties included supervising all employees and officers in the performance of their designated duties, approving or rejecting any financial obligations of Employer "subject to Executive Board consideration between conventions," and being consulted on other matters. (Art. XIX). He was to keep the minutes of conventions and Board meetings, receive all moneys due Employer, keep a correct account between Employer and its affiliates, and have his books ready for examination by the Board. He was to pay out all moneys by check and deposit all money in a bank in Employer's name. All checks had to be countersigned by either the President or Vice-President. The Secretary-Treasurer was to provide the Board and its affiliates with an annual report of Employer's financial condition. He was to engage the necessary personnel to conduct Employer's business and to perform the foregoing duties and such other duties as the Board prescribed.

The Executive Vice-President was a full-time officer who was to perform duties assigned by the convention and Executive Board, under the supervision of the Executive Secretary-Treasurer. (Art. XVIII).

The Executive Secretary-Treasurer and Executive Vice-President were entitled to salaries determined by the Board. (Art. XXII).

Employer also adopted a retirement Plan for the benefit of all full-time salaried employees, with the Plan administered pursuant to a trust agreement. (Art. XXIII).

<u>The Plan; Plan Administration; Pension Committees</u>.

At Employer's 1964 Convention, the Board recommended adoption of the initial pension Plan. The Plan had been studied and recommended by a committee. The Plan was adopted by the members at the convention.

The initial Plan was amended and restated on October 1, 1984, and was amended several times thereafter. The Plan provides retirement benefits to employees according to formulas set forth in the Plan. The Plan is funded entirely by contributions from Employer.

The Plan provides that Employer will appoint one or more Administrators whose primary responsibility is to administer the Plan for the exclusive benefit of the Participants and their beneficiaries, subject to the terms of the Plan. Any person, including an employee, was eligible to serve as Administrator. Plaintiff was named Plan Administrator from January 1986 through August 2006. He received no pay for doing so. He became a Plan participant in 1987.

The Plan also provided for a Trustee. The Trustee was responsible for investing and managing the Plan assets, paying out benefits at the direction of the Administrator, and maintaining records and providing annual reports. The Trustee during the relevant period was the Mercantile Bank of Topeka, which at some point was bought out by and merged into U.S. Bank.

The Plan provided that whenever Employer was permitted or required to do an act under the terms of the Plan, "it shall be done and performed by a person duly authorized by its legally constituted

-7-

authority." The Plan identified Employer, the Administrator, and the Trustee as named Fiduciaries, and that said each one had only the specific powers and duties given them under the Plan. Employer's specific powers and obligations included sole authority to amend the Plan.

Employer engaged an actuary to calculate current and projected premiums and benefits for the Plan. The actuary also filled out required "5500" IRS forms and Pension Benefit Guarantee Corporation (PBGC) forms. The actuary provided the Administrator with an annual report showing what contributions Employer should make to the Plan for the upcoming year. The report showed a range of contributions that would meet IRS minimum and maximum contribution requirements. Plaintiff would select a specific contribution level within this range. He would not seek pre-approval from the Board before doing so, but the expenditures would thereafter be approved by the Board at Board meetings. No one on the Board ever told Plaintiff that he needed to get pre-approval before making or increasing contributions to the Plan.

Under the terms of the Constitution, all funds of Employer, including the Plan trust fund, were required to be audited on an annual basis by an accountant, with the results reported to the Board. There would be a specific line item included in the auditor's report showing Employer's contributions to the Plan. The report included a side-by-side comparison for each line item showing changes from the prior year. The Board would vote to either approve or not approve the audit report. The Board typically approved the audit report with few or no questions asked.

Prior to 2007, Employer's Constitution did not specifically provide for appointment of a Pension Committee, but it gave the President discretionary authority to appoint committees not otherwise provided for.

Plaintiff has cited evidence that a Pension Committee was appointed around January 1987 by Employer's then-President, Dale Moore. (Pl. Exh. 3). The minutes from a Board meeting on October 6, 1987, show this committee adopted a motion to find a new actuary for the Plan. Plaintiff reported to the Board that three companies were being looked at to determine their fees. After a lengthy discussion, the Board decided to study the matter further and get information from these companies "before taking any action by the Board."

Plan Amendments; Practice of Employer.

Under the terms of the Plan, Employer had the right to amend the Plan at any time, subject to certain limitations. (For example, no amendment could be effective if it permitted any part of the trust fund to be used for a purpose other than to benefit participants or beneficiaries, or if it reduced the accrued benefit of any participant except as allowed by law.).

The minutes of a January 7, 1993, Board meeting show that Plaintiff recommended Employer change actuaries and hire Steve Cooper, a local actuary. A Board member made a motion to change actuaries, but the minutes indicate the motion was withdrawn after further discussion. (Def. Ex. 435). There was also discussion about increasing pension contributions and reducing the service period required for full vesting from 10 years to 5 years. When Board member Jim Hastings opined that the vesting period should be reduced to 5

years, another member asked if that would require a motion, but Hastings felt "it would be changed automatically with the new actuary." (It is unclear what Hastings meant by this comment.) The minutes indicate that, notwithstanding the apparent withdrawal of the motion to change actuaries, the Board decided to engage a new actuary.[3]

According to Board minutes from January 12, 1994, Plaintiff told the Board that actuary Cooper was recommending a pension benefit increase of "10%" for active participants. After clarification that such an increase would not apply to the three Plan participants who were already retired, and an estimate from Plaintiff as to the costs, a motion to approve the increase was made, seconded, and carried by the Board. (Def. Ex. 436).

Plaintiff testified he then instructed Cooper to increase the pension benefits by ten percent. The record contains two versions of an amended 1994 Plan with slightly differing formulas. (Pl. Ex. 5 & 6). Both versions were apparently signed on March 23, 1994, with an effective date of October 1, 1994. Each bears Plaintiff's signature (unattested) as well as the Trustee Bank's signature indicating its acceptance of the Plan as amended. Both total up to a maximum pension benefit of 70%, although the first requires only 15 years' service to reach that level while the second requires 18 years' service. (The parties apparently agree that the version requiring 15 years' service was the one enacted.)

---

[3] Although the minutes are less than clear, minutes from a January 1994 meeting indicate the Board had agreed at some point in 1993 to change actuaries and hire Cooper. (Def. Ex. 436).

Plaintiff testified that he did not recall there were two such versions until he saw them in this lawsuit. He said he does not know which one was a draft and which one was final. All he remembers is that he instructed the actuary to increase the pension benefits by 10%, and he relied on the actuary to do it, "whether that was from the 55 to 65 or how he came up with that." Plaintiff executed the 1994 Plan for Employer and the Trustee Bank also executed it.

In reporting to the Board at a meeting on January 11, 1995, Plaintiff discussed a financial analysis which showed that Employer had run a deficit in four of the last five years. He said he would be "shirking his duty" as Secretary-Treasurer if he did not give his recommendation about finances and he recommended that Employer increase the per capita tax by $.05. (Def. Ex. 442). Several board members believed any such request for an increase should be brought before the convention, which was less than a year away, rather than be adopted by the Board. A motion to adopt a $.05 increase was defeated. A motion was carried to adopt a $.02 increase until the issue could be brought before the convention.

Plaintiff signed another Plan amendment in 1995. (Pl. Ex. 7). This 2-page document, dated April 12, 1995, provided that certain employees hired as representatives under the "EDWAA Coordination Program" – which was typically a temporary employment position funded by state or federal grants – shall at termination be entitled to a vested benefit of the greater of the benefit under Article V of the Plan (the general formula for employees) or 19% of their compensation from the date of hire to the date of termination. Plaintiff did not present this amendment to the Executive Board and did not ask

permission to sign it. He testified that "I felt like had authority because of the – my position as the executive secretary." Plaintiff said he signed every plan and trust agreement since 1986 and that his predecessor, Ralph McGee, had done likewise and told him it was his responsibility to do so.

The minutes from a June 4, 1997 Board meeting show that the Board discussed giving Employer's officers (Plaintiff and Vice-President Wayne Maichel) a raise. Outgoing President Dale Moore ran the meeting and Ron Eldridge, the incoming President-elect, was present. A motion to give the officers a 3% raise was made and seconded, followed by discussion about the costs and potential need for a per capita tax increase to fund the increase. When asked what the cost of a 3% raise would be, Plaintiff reported it would be $1,540.68, plus a $292.72 increase in pension and $117.87 increase in social security, for a total of $3,902.00 for both officers. Plaintiff said he appreciated any raise the Board wanted to give, but cautioned that the Board only had "$5,000.00 [expected surplus] to play with" and had to be careful because a raise "may put us in the situation that it is impossible to make payroll, pension payments etc," in which case Plaintiff would have to "come before the Board and beg for a per capital tax increase which no one wants to give, especially in between conventions." The motion for a 3% raised carried.

1997 Plan Amendment.

Plaintiff testified that in 1997 he called President Eldridge and asked him to appoint a pension committee in light of what he said was a favorable actuarial report showing they were in a position to increase pensions. Plaintiff said Eldridge "appointed, you know,

designated – I mentioned some names to him, but he went along with the people for the pension committee." Although Eldridge denies having appointed any such committee, Plaintiff is "very positive" that Eldridge did so. Plaintiff cites a memo which states, "On August 18, 1997, ... President Ron Eldridge made the following appointments to the Kansas AFL-CIO Pension Committee," listing Plaintiff, Wayne Maichel (Executive Vice-President), and Craig Rider (a Board member) as members. Plaintiff said one of the secretaries typed the memo. It was not signed by Eldridge or anyone else. Plaintiff testified the job of the committee was "to try to increase benefits for the Kansas AFL-CIO employees and future beneficiaries." Plaintiff concedes he did not have authority on his own to increase pensions, but maintains the pension committee had authority to do so because it was appointed by the President.

Ron Eldridge repeatedly testified, by way of deposition, that he did not appoint a pension committee in 1997, that he was not aware of the 1997 Plan amendment increasing benefits, and that he never had any conversions with Plaintiff, Maichel or Rider about the 1997 Plan amendment. Eldridge said there had been no discussion about this pension increase at any Board meetings and indicated that any such proposal would have been controversial because Employer was struggling to find the finances to keep operating. He denied ever giving anyone authority to spend money without Executive Board approval. Eldridge added that if he would have appointed a pension committee, he would not have appointed employees to it because he did not think it was right to have people who would benefit from the plan be on the committee. (Eldridge Depo. P. 29).

Plaintiff asked Steve Cooper to come up with a pension benefit increase "that would be helpful to the employees in the Kansas AFL-CIO office and to make sure that we would be able to fund the particular increases in a manner that would not harm the organization." Cooper met with Plaintiff, Maichel and Rider in the fall of 1997, and outlined two proposals – one to increase maximum benefits to 80% of salary and the other to increase benefits up to 85%. These "Proposals for Amending Benefits" are shown in Pl. Ex. 11. The document compared current projected benefits with projected benefits under the two proposals, listing projected benefits for each of Employer's five employees at the time: Plaintiff, Maichel, secretaries Dona Anderson and Karen Maas (also officer manager), and political director Connie Stewart. Plaintiff said Cooper considered both proposals feasible and that "the pension committee voted unanimous[ly] to accept the 85%."

After the meeting, Plaintiff asked Cooper "to increase the pension benefits for all the Kansas AFL-CIO employees to the 85% rate." Plaintiff testified he did not take this proposal to the Board "because, you know, when I was talking to the president and he made the appointment, it was indicated to me that, you know, let's try to do something with the pension benefits. And so I thought I had the authority to go ahead and increase the pension benefits without taking it back to the Board." Plaintiff also indicated that because Cooper thought the proposal was feasible, the committee did not examine reasons not to adopt an increase.

Karen Maas did a lot of the secretarial work in Employer's office and also served as an office manager. She had worked for Plaintiff at the Pipefitter's Union before she starting with Employer.

Maas remembers overhearing the 1997 meeting between Cooper, Plaintiff, Maichel and Rider at which a pension increase was discussed. She heard Cooper say the increase would be fine and all the pension committee members agreed with it. The meeting closed and she heard them say, "well, go ahead with that then." Cooper came and talked to the employees about a month later and explained how the proposed changes would increase their pensions.

Plaintiff and the Trustee Bank executed a four-page amendment on May 1, 1998, which included a change in the Retirement Benefit formula in Section 5.01 of the Plan. This amendment (Pl. Ex. 14) provided that employees would receive a monthly benefit of 1.24% of monthly compensation for up to 5 years' service, plus 2.32% for each year not to exceed 10 years, plus 3.70667% for each year not to exceed 15. This works out to a maximum benefit of 85% available to employees with 15 years of service at normal retirement age. The amendment stated it was effective October 1, 1997, which would make it retroactive. The Board was not informed about the amendment at meetings before or after its execution. At the time of the change Employer had only four employees – Plaintiff, Maichel, Maas and Anderson.

The 1998-1997 audit report contained a line item showing an increase in pension payments of almost $16,000 (from $29k to $46k), but Plaintiff made no mention of it at the next Board meeting. When asked at trial why he did not mention it, Plaintiff said "they were grown individuals and they could sit there and read the audit" and ask questions if they wanted. He said "it would be so time-consuming that the executive board meeting would last forever if you went over every

-15-

line," and he saw no reason to raise it. The court was especially unimpressed with this blatantly self-serving statement, which reinforced the court's overall assessment of the evidence as pointing to Plaintiff's intent to hide the increase.

The foregoing audit report, which was based on information provided by Plaintiff and/or other employees, included a notation stating that the Plan had been established in 1964, amended in 1970, and restated in 1974. It did not mention the 1993 or the 1997 amendments. Audit reports for the following years contained similar notations.

As indicated above, the evidence directly conflicts as to whether or not Eldridge appointed a pension committee in 1997. On balance it indicates he did not. Plaintiff's testimony about appointment of the committee was vague and implausible. But even assuming Eldridge did appoint a committee, there is absolutely no credible evidence that in doing so he gave Plaintiff or this committee authority to amend the Plan for the purpose of increasing discretionary retirement benefits or to otherwise act for the Board. Plaintiff testified he thought the committee had such authority because Eldridge told him "let's try to do something with the pension benefits."[4] Again, even assuming (against the weight of the evidence) such a statement was made, it would not reasonably support Plaintiff's claim that the committee was thereby given carte blanche authority to amend the Plan to increase benefits. Plaintiff must have been aware

___

[4] By contrast, Plaintiff claimed that he thought he had authority to unilaterally amend the Plan in 1995 because of his position as Executive Secretary-Treasurer.

that Employer had sole authority to amend the Plan. He must have been aware that any financial obligations undertaken were subject to Board consideration and that the practice of the organization was for the Board to have the final say on such financial commitments. And he must have been aware that the Board was responsible for setting aside the funds necessary to provide pension benefits. Plaintiff's testimony to the contrary simply is not credible.

Plaintiff was clearly familiar with Employer's general practice of having committees study assigned problems and make recommendations to the Board, with the understanding that the Board had authority to adopt or reject committee recommendations. In 1994 Plaintiff himself successfully sought the Board's approval for a proposed ten percent increase in the retirement benefit. He was clearly aware at that time that such a significant financial commitment required Board approval. He cannot plausibly deny being similarly aware in 1997 that increasing the potential retirement benefit to 85% required Board approval. The fact that Plaintiff did not mention this amendment at the next Board meeting or call the Board's attention to the resulting increase in Employer's pension contributions – particularly at a time when he knew Employer was struggling to maintain revenue – is clear evidence that Plaintiff was trying to slip the 1997 pension increase past the Board.

Other Amendments.

Plaintiff testified that in 1999 the Plan had to be amended in certain respects to comply with federal law and at the same time the pension committee decided to reduce the normal retirement age under the Plan from 65 to 63. Plaintiff asked Cooper to determine what effect this would have. Cooper produced a memo for Plaintiff and

-17-

Maichel comparing the percentage of benefits available under the 1997 amendment and under this proposed 1999 change. (Pl. Ex. 15). Plaintiff testified that he and Maichel constituted the pension committee at that point and they approved the change. On November 10, 1999, Plaintiff signed a Plan Amendment which, among other things, changed the Normal Retirement Age under the Plan to 63. The effect of this change was to allow employees with 15 years' service to retire at age 63 and obtain the full 85% benefit. Plaintiff did not bring this amendment before the Board. He testified he thought he had authority to make such changes and that he was acting in the best interests of the participants because improving benefits was "one of the number one goals of the Kansas AFL-CIO."

The 1999 change in retirement age was described in a Summary Plan Description (SPD) prepared by Steve Cooper. (Pl. Ex. 24). That SPD also stated that the Plan had been amended effective October 1, 1997, to increase benefits. Included in the SPD was the 85% benefit formula, although the 85% figure was not mentioned and one would have to multiply and then add the component parts of the formula to determine that it totaled 85%. Plaintiff testified that he or a secretary would hand-deliver the SPDs to the employees in the office.

Plaintiff "totally relied" on Cooper to prepare the required IRS Form 5500s for the Plan. The Form 5500 for 1997, which was signed by Plaintiff and filed at the end of 1998, included a question and answer showing that the Plan had been amended on May 1, 1998. (Pl. Ex. 20).

As noted previously, the annual audit reports provided to the Executive Board included a line item showing pension fund payments for the current and previous year (with Plan years ending August 31). The

audit report dated October 1, 1999, included a line showing that pension fund payments were $29,264 in 1998 and $46,003 in 1999. (Pl. Ex. 75). This report was given to the Board at its January 19, 2000 meeting. Plaintiff does not remember the Board ever asking questions about any audit report, including this one. Plaintiff gave a financial report at the meeting, pointing out Employer's total revenue and expenditures left net assets of $29,053 in the general fund. He recommended to Board members that they take the report home, review it, and bring any questions they had to the next meeting, when the Board would take action on the report. A motion by Board member Wil Leiker was carried which required that in the future the audit reports be mailed to Board members two weeks before board meetings.

Cooper's actuarial valuation for the Plan for 2002, which was based on a valuation date of October 1, 2001, showed a negative investment yield on Plan assets for the past year. (Pl. Ex. 67). This was due primarily to a downturn in the stock market. The following year was only slightly better, with an investment return of less than 1%. (Pl. Ex. 68).

On January 14, 2003, Plaintiff and the Trustee Bank signed an October 1, 2002 Restatement of the Plan. The restated Plan was prepared by Cooper at Plaintiff's direction. It incorporated the 85% benefit formula and a normal retirement age of 63, and included other changes previously set forth in the amendments of 1994, 1997 and 1999. (Pl. Ex. 18). The Board was not notified of or consulted about the restatement.

Plan funding problems.

Cooper prepared and sent required ERISA notices to participants

regarding the Plan's funding level. A notice for 2001 disclosed that the Plan had 92.5% of the money needed to pay promised benefits. A notice for 2002 showed the Plan had 86.7% of the money needed to pay promised benefits. Cooper also provided participants with benefit statements showing what their retirement benefit would be.

The accountant's audit reports for the years ending August 31, 2002-2005 show the emergence and growth of a gap between the actuarial present value of vested accumulated Plan benefits (essentially the amount needed currently to meet future promised benefits) and the available Plan assets. An actuarial valuation in October 2001 for the Plan year ending September 2002 showed a present value of vested accumulated Plan benefits of about $1.37 million, with Plan assets of about $1.34 million. (Pl. Ex. 78). For the Plan year ending September 2003, the present value of vested benefits was about $1.67 million and Plan assets were about $1.53 million. (Pl. Ex. 79). For the Plan year ending September 30, 2004, an audit report stated that the present value of accumulated benefits was $1.81 million, with Plan assets of about $1.60 million. (Pl. Ex. 81).

Cooper's actuarial valuation for the year ending September 30, 2004, said the Plan "is currently underfunded and has used up its formerly substantial funding credits." (Pl. Ex. 70). It attributed the "huge jump" in required minimum contributions to three factors: the entrance of a new participant who was only 5 years from normal retirement age (referring to 58-year old Wil Leiker, who had been hired in 2003), the retirement without replacement of two participants (Maas and Stewart), and the Plan's "very rapid accrual of benefits during the first five years of participation" – again referring to

Leiker, who would become 100% vested after 5 years. It said good investment returns might help but "it will be difficult to overcome the high contributions required in the next five years."

The Plan's significant and growing underfunding problem was likely due to a combination of several factors, including the benefit increases signed by Plaintiff, a downturn in the stock market, the entrance and vesting of Leiker in the Plan, and the retirement of employees without replacement.

Plaintiff was considering retirement in 2005 and asked Cooper to figure out what his pension would be if he retired in 2006. Cooper said he would do so but cautioned that "we need to do something with the pension fund" because "it's too far underfunded" at 83% and needed corrective action. Plaintiff testified he was surprised by this because he had heard of funds operating at much lower levels of funding. The minutes of the Board's next meeting, on October 12, 2005, include the following:

> Jim [DeHoff] gave a pension report. He advised that the pension is a little underfunded. Jim asked for the board's consensus to allow the officers to work with actuarial [sic] to make sure we do not become underfunded. Jim also asked the board to give Wil [Leiker, Executive Vice-President] and he the authority to work with the actuarial to make an evaluation to make sure it goes forth and also the authority to make adjustments to it. Wil assured the board that he, Jim & Dona [Anderson] would not be giving themselves pension increases.
>
> Jerry Lewis made a motion for Jim and Wil to look at the pension and gave authority to make adjustments to it. Seconded. Motion carried.

(Pl. Ex. 97).[5]

Plaintiff, Leiker, and Cooper met around October 19, 2005, to discuss the Plan's inadequate funding. Cooper summarized four possible options, including freezing all future accruals under the Plan, "leveling out" accruals over 15 years, leaving the Plan as is, and altering the benefit formula. He analyzed the effect of each on Employer's required contributions. (Pl. Ex. 32). If no changes were made, Employer's required contributions for the four years 2004-2007 were estimated to be $111,298, $118,010, $174,392, and $132,302. (Pl. Ex. 33).

Plaintiff and Leiker met with Cooper again on October 27, 2005. During that meeting Cooper provided (apparently at Leiker's request) a "history of benefit changes" under the Plan. This one-page summary indicated that in 1994 and again in 1997 the "pension committee met with the plan actuary and determined" that circumstances allowed an increase in the benefit formula, with an increase to 70% in 1994 and to 85% in 1997. Cooper went over the history with Leiker. Prior to this meeting, Leiker had asked secretary Dona Anderson, who worked for both Plaintiff and Leiker, to listen in on the meeting from her desk outside the meeting room and to take minutes of the meeting for Leiker's exclusive use. (Pl. Ex. 36).

At some point in their dealings, Leiker told Plaintiff he thought the pension committee had acted without authority when it increased pension benefits in 1997. Plaintiff responded by saying the committee

_____

[5] In this instance the Board clearly delegated authority to the committee to make changes to the Plan. Once again, this highlights Plaintiff's understanding of Employer's standard practice of obtaining Board approval for such actions.

had authority because it had been appointed by the President with instructions to improve the pension plan. There is a discrepancy in the testimony as to whether this conversation took place in 2005 or later, although circumstances indicate it was probably in 2007.

Plaintiff and Leiker could not agree on what to do about the Plan's funding problem. Cooper recommended seeking waivers from the IRS for at least a portion of Employer's required contributions. Cooper drafted a waiver request for the Plan year ending September 30, 2005, and Plaintiff signed and submitted it. (Pl. Ex. 37). Leiker signed a check for the waiver application after Plaintiff told him "Cooper said we have to file this or they're [the IRS] gonna bang us." The application indicated that, as of September 30, 2004, the present value of accrued vested benefits was about $2.0 million and the fair market value of Plan assets was $1.6 million, a shortfall of over $400,000. (Cooper Depo, Ex. 63). The IRS responded to Plaintiff by asking for more information, including a request for actuarial valuations for 2004 and 2005 and Form 5500 for 2004. (Pl. Ex. 40). Plaintiff testified he did not inform the Board about the IRS funding waiver request because of time constraints and because Cooper said the request was helpful to the pension fund.

Plaintiff testified he had not realized the required IRS and PBGC forms (and premiums) for earlier years had not been filed. Although Plaintiff was responsible for signing such forms, he said he had not noticed their absence, indicating he simply relied on Cooper to provide them when they were due and routinely signed off on them. When Plaintiff contacted Cooper to ask him to prepare the overdue forms, Cooper told Plaintiff he would have to find a new actuary because he

had decided to let his IRS enrollment lapse.

Plaintiff located actuary Wanda Ehrhardt, out of Chicago, Illinois, who agreed to provide services for the Plan without charge. Plaintiff wrote her on January 26, 2006, providing information that Cooper said should be sufficient to allow her to compile the 2005 actuarial valuation. (Pl. Ex. 43). The letter noted the underfunded status of the Plan and mentioned Cooper's recommendation to seek a waiver from the IRS, but Ehrhardt later determined a waiver was not necessary. As a result, Plaintiff wrote the IRS on March 8, 2006, to withdraw the waiver request. (Pl. Ex. 44). Plaintiff's letter to Ehrhardt also stated that the pension committee would take prudent actions to satisfy future minimum funding requirements. Plaintiff testified he had a discussion with Leiker about increasing Employer's contributions to the Plan, that Leiker "went along with it," and the contributions were increased.

Plaintiff wrote Ehrhardt again on May 26, 2006, informing her that his elected replacement – Andy Sanchez – would be 46 years old when he started. Plaintiff asked Ehrhardt to figure out benefits based on a contribution of $4,100 per month, although he said Employer would continue making $6,100 monthly contributions, which "should level out" the fund. He asked for "some options on benefit changes real soon" because he wanted to get everything taken care of before he retired. (Pl. Ex. 47).

In June of 2006, Plaintiff filled out an application and election form for retirement benefits. (Pl. Ex. 48). He was 61 years old at the time. Under his election, his monthly benefit would be $3,702.74, as

calculated by Ehrhardt, and was to commence on September 1, 2006.[6] In his capacity as Plan Administrator, Plaintiff had to sign a form declaring that the payment of these benefits was appropriate under the Plan. Due to the questionable appearance of approving his own benefits, Plaintiff asked Leiker to sign the form as well, which he did. (Pl. Ex. 48). Leiker's explanation for this at trial was that at the time he did not fully appreciate what Plaintiff and the committee had done to change benefits.

Plaintiff wrote Ehrhardt again in June and forwarded a notice from the PBGC stating that the Plan had not submitted its required premium in July of 2005.

In July 2006, Ehrhardt provided Plaintiff a draft of possible changes to improve the Plan's funding. The changes would only apply to employees who became participants on or after January 1, 2006. The proposals included: altering the benefit formula (to 3.5% of average monthly pay times years of service, with no maximum); raising the normal retirement age to 65 (and 5 years' service); requiring at least 6 years of service for early retirement; a limitation on disability and death benefits; and elimination of a lump sum option. Leiker testified that although he discussed the Plan's problems with Plaintiff during this period, Plaintiff kept him in the dark about his dealings with Ehrhardt and her suggestions.

Plaintiff's last Board meeting was August 3, 2006, during which he gave a pension fund report. He noted the Plan was underfunded at

---

[6] Plaintiff elected an option that included a 50% survivor benefit for his spouse. Additionally, his benefit was reduced according to an early retirement formula because he was retiring before the (amended) normal retirement age of 63.

83% and he presented Ehrhardt's proposals to address the problem. He pointed out that the fund's investments had been down the last few years and noted there would soon be six retirees and only three active employees. He said the Plan required changes "in order to level out." President Mark Love appointed a six-person Pension Committee that included Love, incoming Executive Secretary Treasurer Andy Sanchez, and Vice-President Leiker.

Sometime after the August 2006 Board meeting, Leiker sent a memo to Dona Anderson asking her to look into Employer's records for Board authorization for the pension plan changes made by Plaintiff. (Pl. Ex. 52). He also requested copies of communication between Plaintiff, Cooper, and the Bank. In the memo Leiker questioned the authority for these changes and asserted that Employer had incurred substantial PBGC penalties because of a shortfall in funding caused by the changes.

In December of 2006, Leiker contacted Jim DeMars, the owner of a pension consulting firm in Overland Park, Kansas, and engaged his firm to review and help with the pension situation.

At an August 30, 2007 meeting of the Pension Committee, Leiker explained how a review showed that the Plan was not properly funded and that pensions had been increased without Board approval. He said the Plan had been improperly handled and needed to be straightened out. DeMars explained how his firm had arranged for Employer to file three years' of overdue 5500s to avoid large penalties. He said the records indicated pension benefits had been increased without Board approval and suggested benefits could be reduced to the level authorized. He noted some participants might "say 'bull'" and there could be legal implications from employees claiming their pensions

were being cut. DeMars said another option was to freeze the pensions. A motion "to go back to the 65 point multiplier of the Pension Plan as approved in 1993 & 1994" was unanimously adopted by the Committee.

At the next Board meeting, on September 6, 2007, Vice-President (and now Plan Administrator) Leiker and Demars gave extensive reports on the Plan. Among other things, DeMars recounted the failure to file forms in prior years and said Employer could have saved $48,930.10 if the Plan had been kept current or if Employer had gone to the IRS earlier to seek a resolution. As a result of the failures Employer ended up having to dip into contributions earmarked for later Plan years to adequately fund earlier years, and it had to make a lump sum contribution of $20,981 to meet its obligation for the year ending September 30, 2006. Both Leiker and DeMars indicated the prior pension increases had been improper because they were done without Board approval. DeMars provided the Board an analysis showing the Plan was underfunded by about $500,000 under the 85% formula, and would be about $360,000 underfunded under the old formula. He said Employer had to pay a higher (variable) premium to the PBGC so long as the Plan was funded at less than 90%. There was discussion about going back to the benefit level that had been approved by the Board. DeMars indicated they could go back and say the increase had been improper – he characterized it as people getting a gift they were not due – but noted the possibility that affected employees could hire an attorney and claim their benefits were improperly cut. Even going back to the prior formula, DeMars said Employer would have to make contributions of around $90,000-$100,000 a year to get the Plan back to 90% funding.

Leiker made a motion at the September 6, 2007 Board meeting that

they "return to a 65 point multiplier, employees be given credit for all service, [and that] this apply to anyone who has retired after 1994." The motion was seconded and carried unanimously.

Employer's monthly contributions to the Plan were about $2,701 ($32,412 annually) in 1997. They increased to $3,792 ($45,504 annually) by 1999 and were up to $4,448 ($53,376 annually) in 2003. In 2006, they jumped to $6,194 ($74,328 annually) and to $7,500 ($90,000 annually) in 2007. Employer also had to make a lump sum of contribution of over $20,000 in 2007, which was applied to the September 30, 2006 plan year.

Reduction of Benefits.

Plaintiff retired effective September 1, 2006, and began drawing a pension. In November of 2007, he received a letter from Employer stating that his pension was being reduced to $3,026.24, a reduction of $676 per month. Plaintiff was very upset. He noticed the letter said nothing about a right to appeal. He called Andy Sanchez and told him ERISA prohibited cutting pensions. He also complained about the lack of an appeal process. Leiker called Plaintiff on November 21, 2007, and told him if he had a problem, he could come into the office and they would show him the documents. He did not tell Plaintiff he could appeal the decision, nor did he explain any appeal process or provide Plaintiff a form for appealing.

Plaintiff received an additional $10,147.50 in benefits as a result of the 1997 amendment that he would not received under the prior formula.

Wayne Maichel retired in 2003. He received a pension benefit from 2003 to 2007 based on the 85% formula of the 1997 Plan Amendment.

Karen Maas retired in 2004, and also received a pension benefit based on the 1997 formula.

DeMars calculated the present value of accrued benefits (both vested and unvested) for the Plan under the 85% benefit formula as compared to the present value under a 70% formula. (Def. Ex. 428). As of October 1, 2007, and using a 5.11% rate of interest, the values would be: $2,365,414 and $2,190,983, a difference of $174,431.

DeMars determined that Employer's 5500 forms for 2003 and 2004 had not been filed. These forms are due seven months after the end of a plan year. In the case of defined benefit plans (such as Employer's), a Schedule B actuarial certification must also be attached. There are penalties of up to $15,000 per year if the Department of Labor (DOL) discovers non-compliance with the filing requirements. Through a voluntary compliance program, DeMars was able to limit Employer's penalty to a $1,500 fine and to file the required forms.

DeMars determined from actuarial reports that the Plan was underfunded. As of October 1, 2007, and using the 85% benefit formula, he calculated it was underfunded in the amount of $509,769. (Def. Exh. 429). Up to $164,000 of this was attributable to Leiker's participation in the Plan. As of an October 1, 2009 actuarial report, and using a 70% benefit formula, the underfunding was reduced to $54,630. DeMars identified the following factors in the substantial reduction of underfunding: the reduction of benefits for Plaintiff, Maichel and Maas; the death of two participants; the retired participants were two years older; and employer contributions at the rate of $7,500 per month.

Leiker had first been elected to Employer's Board in 1997 and began attending Board meetings in January of 1998. At the January 1998 meeting, Leiker did not ask any questions about the audit report showing a $16,000 increase in pension contributions. He testified that after the meeting he asked Maichel if the increase was due to market fluctuation. According to Leiker, Maichel said that would be his understanding but he really didn't know.

Although in September 2007 the Board had approved a "return to a 65 point multiplier," Leiker signed an adoption agreement in June 2009 which contains a formula that results in a 70% maximum benefit. (Def. Ex. 433).

Leiker retired from Employer on December 1, 2009, at age 63. His monthly pension benefit after having worked for Employer for about six years is around $1,800.

## II. Conclusions of Law.

### A. **Plaintiff's claims**.

Plaintiff asserts that he had actual, apparent, or implied authority to adopt the 1997 Plan amendment increasing benefits. He contends the subsequent reduction of his retirement benefits in 2007 violated ERISA's Anti-Cutback Rule, 29 U.S.C. § 1054(g). (Doc. 55 at 14).

ERISA does not require employers to establish employee benefit plans. But when employers choose to provide such benefits, ERISA protects employees' justified expectations that they will receive the benefits promised them. In enacting ERISA Congress "wanted to ... mak[e] sure that if a worker has been promised a defined pension

benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit – he actually will receive it." Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996).

ERISA's anti-cutback rule is crucial to this objective. Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 744 (2004). With few exceptions, the rule prohibits any amendment of a pension plan that would reduce an employee's "accrued benefit." 29 U.S.C. § 1054(g) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan...."). For a defined benefit plan, "accrued benefit" means the individual's accrued benefit determined under the plan and expressed in the form of an annual benefit commencing at normal retirement age. 29 U.S.C. § 1002(a)(23). This definition is "a signpost" directing the court to look at the terms of the plan at issue. See Bd. of Trustees of Sheet Met. Workers' Natl. Pension Fund, 318 F.3d 599, 602-03 (4th Cir. 2003).

The problem here is: what terms were validly part of the Plan? Plaintiff executed the 1997 amendment, purportedly on Employer's behalf, as well as the 2002 Plan restatement, both of which promised to provide employees with an 85% retirement benefit if they met the service requirements. But Employer's Board never authorized or approved these changes.

ERISA requires that every employee benefit plan "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3). A provision stating that a plan may be amended "by the Company" is sufficient to satisfy this requirement. Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73 (1995). Like the plan in Curtiss-Wright, Employer's plan here

simply said "Employer" had the right to amend the Plan. In this context, "principles of corporate law provide a ready-made set of rules for determining ... who has authority to make decisions on behalf of a company." <u>Curtiss-Wright</u>, 514 U.S. at 80. In determining whether the amendment procedure was complied with, "[t]he answer will depend on a fact-intensive inquiry, under applicable corporate principles, into what persons or committees within [the company] possessed plan amendment authority, either by express delegation or impliedly, and whether those persons or committees actually approved the new plan provision...." If an amendment was not properly authorized, a question may still remain whether subsequent actions served to ratify the provision after-the-fact. <u>Curtiss-Wright</u>, 514 U.S. at 85.

"Corporate authority may be conferred in many different ways." 2 Fletcher, Cyc. Corp. §444. It may come from articles of incorporation, bylaws, or corporate action appearing in minutes. It may be shown by ratification. It may be conferred by implication or implied by circumstances from the acquiescence of the corporation or its agents in the general course of business. <u>See</u> <u>e.g.</u>, 2 Fletcher, Cyc. Corp. §444. <u>See</u> <u>also</u> <u>Schoonejongen v. Curtiss-Wright Corp.</u>, 143 F.3d 120, 127-28 (3rd Cir. 1998).

As an initial matter, the court rejects Plaintiff's claim that President Eldridge expressly authorized Plaintiff or the purported 1997 pension committee to unilaterally increase pension benefits. Eldridge's testimony on that point is far more credible than Plaintiff's, and the evidence as a whole shows there was no authorization for Plaintiff or any such committee (if it existed) to

obligate Employer to whatever pension increases Plaintiff or the committee thought appropriate.

Plaintiff otherwise contends he was duly authorized to make amendments to the Plan because he was Employer's chief executive officer, he was the designated Plan Administrator, and "he had signed every plan document and agreement for his entire 20 years of employment." None of these assertions, however, support a finding that Plaintiff had unilateral authority to amend the Plan to increase pension benefits. Plaintiff's powers as Executive Secretary Treasurer were expressly defined by the Constitution and by-laws. They did not include authority to unilaterally bind Employer on financial matters or to promise increased pension benefits. See K.S.A. § 17-6301(a)(the business and affairs of every corporation shall be managed by or under the direction of a board of directors, except as may be otherwise provided). Any authority Plaintiff had to approve financial obligations of Employer was expressly made subject to Board consideration between conventions. Plaintiff concedes this, but argues there was no requirement for Board approval because to "consider" something only means to "give it thought." (Doc. 64 at 8). He does not explain how the Board could have given the matter thought when he effectively concealed if from the Board. This attempt to water-down or neutralize what was surely intended as a limitation on the powers of the Secretary-Treasurer is contrary to the most reasonable reading of the phrase. Cf. Schoonejongen, 143 F.3d at 128 (by-laws granting executive officer authority to take "general and active control of [the company's] business and affairs" was a grant to do anything the corporation could do in the general scope and operation of its

business). It is also contrary to the framework of Employer's Constitution and Employer's historical practice. The Board obviously delegated authority to Plaintiff to manage the day-to-day affairs of the organization, but this did not include undertaking large financial commitments without Board consent. Employer not only adhered to a general requirement for Board approval of expenditures in the course of its operation, but it did so specifically with regard to prior pension increases. This is illustrated by the 1994 amendment, which was preceded by Plaintiff bringing a proposal before the Board to increase pension benefits by ten percent. Plaintiff executed the 1994 amendment raising the pension benefit only after he obtained the Board's approval for the increase.[7] See also Pl. Exh. 3, Exec. Bd. Minutes of 10/06/1987 ("After a lengthy discussion regarding the present pension plan, it was decided to study further our present plan and gather information from new companies before taking any action by the Board.").

It is true that Plaintiff sometimes made expenditures that the Board approved after-the-fact, but these were generally de minimus matters. Moreover, such expenditures were typically brought before the Board at the next meeting (or within the year) with the implied understanding that the expenditures were not validated until the Board approved them. By contrast, the 1997 Plan Amendment was never brought

---

[7] Plaintiff's failure to disclose the 1997 pension increase to the Board speaks volumes. Had he believed Eldridge gave this committee blanket authority "to improve benefits," Plaintiff almost surely would have reported back to the Board that the committee acted to increase the maximum benefit. The fact that he did not do so, at a time when both he and Maichel benefitted personally from the amendment, suggests a self-dealing act that was concealed from the Board out of awareness or apprehension that the Board would not approve the increase.

to the Board's attention and the Board never gave its approval for the substantial benefit increase. Plaintiff's failure to disclose the 1997 pension increase to the Board speaks volumes. Had he believed Eldridge gave this committee blanket authority "to improve benefits," Plaintiff almost surely would have reported back to the Board that the committee acted to raise the pension benefit. The fact that he did not do so, at a time when he and Maichel benefitted personally from the increase, points to a self-dealing act that was concealed from the Board out of awareness or apprehension that the Board would not have approved the increase.

Plaintiff's suggestion that the Board nevertheless authorized the 1997 amendment because it approved the resulting increase in pension contributions is unpersuasive. Perhaps a more vigilant Board might have detected the increase and questioned the reason for it, but it cannot reasonably be said the Board's unwitting approval of a line-item pension contribution was a grant of authority to Plaintiff to promise increased retirement benefits. The evidence shows no fair disclosure of the 1997 Plan amendment to the Board and no grant of authority for Plaintiff or a committee to adopt such an increase. The fact that some costs of the amendment were slipped under the radar did not amount to Board authorization to increase benefits. In sum, the evidence shows there was no express, implied or other delegation of authority to Plaintiff or to a pension committee to enact the 1997 pension increase. The same is true with respect to the 2002 Restatement of the Plan embodying the 1997 change, which Plaintiff also executed without informing the Board or obtaining its approval.

Plaintiff's authority as Plan Administrator was likewise

circumscribed. He was authorized "to administer the Plan" for the exclusive benefit of the Participants and their beneficiaries "subject to the terms of the Plan." The Plan gave sole authority to amend to the Employer, not to the Administrator. And as noted above, Employer's executive authority was vested in the Board, not in Plaintiff. The Administrator had no express authority to amend the Plan. The evidence does indicate that Plaintiff was given express or implied authority as Administrator to execute various technical and required Plan documents – including tax forms and audit reports – without obtaining Board approval. This is consistent with the Plan's delegation to the Administrator of "all powers necessary or appropriate to accomplish his duties under the Plan," including a duty to administer the Plan in compliance with ERISA and its regulations. (Pl. Exh. 6 at 19).

The Plan also gave the Administrator a duty regarding pension contributions, but his assessment of contributions was to be reported to the Board for it to take action.[8] The Plan also imposed a duty on him "to consult with the Employer ... regarding the short-term and long-term liquidity needs of the Plan...." And as Administrator he had authority to "direct the Trustee with respect to all nondiscretionary or otherwise directed disbursements...." But his position as Administrator gave him no authority – express or implied – to promise discretionary new benefits on Employer's behalf. See CIGNA Corp. v. Amara, 131 S.Ct. 1866, 1877 (2011) (noting that under ERISA, the plan sponsor creates the terms of the plan; the administrator manages the

---

[8] Under the Plan the Administrator was to "compute and certify to the Employer and to the Trustee ... the sums of money necessary or desirable to be contributed to the Plan." (Pl. Exh. 6 at 20).

plan, following its terms in doing so).

Nor does the fact that Plaintiff and his predecessors signed all Plan documents on behalf of Employer mean that he or they were somehow granted authority to commit Employer to new pension obligations. In his role as chief executive officer, it was naturally within Plaintiff's authority to execute documents on Employer's behalf when the Board gave its approval of a financial undertaking. Similarly, the execution of documents required to keep the Plan operating lawfully would logically be within the actual or implied scope of Plaintiff's authority as chief executive officer and/or Plan Administrator. But a power to act in furtherance of the Board's directives or to keep the Plan running lawfully simply does not imply a power to commit Employer to discretionary new pension increases without Board consent. In sum, the evidence shows Plaintiff executed the 1997 Plan amendment without authority to do so, and that the amendment and the resulting 85% benefit provision was not a valid term of the Plan.

Ratification. Plaintiff relies alternatively on the concept of ratification, arguing that even if the 1997 amendment was not authorized, Employer's subsequent actions nevertheless ratified the change. (Doc. 64 at 12). He cites four arguments in support. First, he says Employer issued SPDs to employees containing the 85% formula. But it was actually Plaintiff as Plan Administrator who directed the preparation and distribution of the SPDs, not the Board. At any rate, the language of the Plan itself controls over any conflicting language in an SPD. See CIGNA Corp. v. Amara, 131 S.Ct. 1866, 1877 (2011) ("we have no reason to believe that the statute intends to mix the responsibilities by giving the administrator the power to set plan

terms indirectly by including them in the summary plan descriptions."). Second, he notes the Board approved without question the annual reports showing an increase in pension contributions. Ratification requires knowledge of the material facts, however, and there is no evidence the Board was aware of the material fact that Plaintiff had increased the pension benefit. <u>Clark v. Brien</u>, 59 F.3d 1082, 1088 (10th Cir. 1995) ("For ratification to be valid, it must be done 'with knowledge of the material facts.'") Third, he says Employer "conducted itself in accordance with the 1997 Plan Amendment for ten years," pointing out that each employee who retired after 1997 received benefits under the 1997 formula. The rights of pensioners other than Plaintiff are not before the court in this lawsuit.[9] Insofar as Plaintiff's pension is concerned, Employer cannot be said to have ratified the payment of an 85% benefit when it did not realize Plaintiff had altered the benefit formula without the Board's authorization. <u>Town Center Shopping Center, LLC v. Premier Mtge. Funding, Inc.</u>, 37 Kan.App.2d 1, 148 P.3d 565 (2006) ("The key to

_____

[9] Apparent authority results from a manifestation by a principal that another is his agent and exists only to the extent it is reasonable for a third person dealing with the agent to believe the agent is authorized. <u>Restatement (Second) of Agency</u> § 8 (1958). Because pensioners other than Plaintiff might conceivably claim they reasonably believed Plaintiff had been authorized by Employer to amend the Plan – something Plaintiff himself cannot claim – their rights with respect to the Plan could differ from Plaintiff's. <u>Cf</u>. 2 Fletcher Cyc. Corp. §434 ("[I]f a corporation, intentionally or negligently clothes a particular officer or agent with apparent authority to act for it in a particular matter, it cannot deny that individual's authority as against persons dealing with him or her in good faith.") <u>See</u> <u>also</u> Exh. 422, Plan §2.03 (Employer shall periodically review the performance of any fiduciary to whom duties have been delegated under the Plan). But the court need not – indeed cannot - decide the rights of Plan participants who are not parties to this action and over whom it has no jurisdiction.

-38-

ratification is knowledge of the unauthorized act; without a showing of the principal's knowledge, the principal cannot be deemed to have ratified the act."). There is no evidence that Employer failed to take timely action once it came to this realization. Lastly, in the same vein, Plaintiff complains that Leiker received a memo from Cooper in 2005 "explicitly stating that the 1997 pension committee had modified the pension benefit" to an 85% maximum. Actually, the memo said only that in 1997 the pension committee determined that conditions "allowed further changes" in the formula to 85%. It did not state or necessarily imply that the committee by itself enacted the change without Board approval. (In fact, the memo used the same language with respect to the 1994 amendment, although the Board in that instance had in fact authorized an increase.). In sum, Plaintiff has not shown that Employer failed to take timely action once it realized the material facts. The evidence shows no ratification of the 1997 amendment or the benefit formula of 85%.

Appeal Rights. Plaintiff raised an issue in the Pretrial Order about whether the Plan or Employer failed to give him proper notice of appeal rights under ERISA. He also presented evidence on that point at trial. Even assuming there was such a failure, however, it warrants no relief under the circumstances of the case. Plaintiff has not claimed or shown any damages from such a failure. Nor is there any argument here by the Plan that Plaintiff failed to exhaust available administrative remedies. There was a final determination of Plaintiff's benefits and the action is properly before the court. Any failure to advise or allow Plaintiff an administrative appeal is not

grounds for relief.[10]

Reduction of Benefits to 65%. Aside from the validity of the 1997 amendment, Plaintiff argues Employer violated the anti-cutback rule by voting to reduce his accrued benefit to a maximum 65% of pay. He points to a stipulation in the Pretrial Order that "[t]he benefit formula of the Plan was increased in 1994 and was 70% of pay...." (Doc. 55 at 3). Plaintiff contends Employer's determination to reduce pensions to 65% – i.e., 5% below the stipulated level – is a per se violation of the anti-cutback rule. (Doc. 70 at 4).

The parties' discussion of this issue is not particularly helpful. Plaintiff's complaint alleged that his accrued benefit had only been reduced to 70% of pay. (Doc. 1 at 5). In the Pretrial Order, he appeared to allege a cut to 65%, although it was not clear that he was arguing anything other than the validity of the 1997 amendment and its 85% benefit. Nevertheless, Plaintiff presented evidence that his benefit was based on a 65% limit and he argued in a post-trial brief that this was a violation of the anti-cutback rule. (Doc. 70 at 3). Counterclaimants did not address the issue in their post-trial brief (Doc. 71), but in a post-trial email they cryptically asserted that "[t]here is no cut from 85% to 65% ... because we have stipulated to 70% as the 1994 benefit in the Pretrial Order."

The evidence at trial about whether Plaintiff received a benefit based on a 65% or a 70% maximum figure was not much clearer than the arguments. The court understood the evidence to show that,

_____

[10] To the extent Plaintiff's allegations could be construed as seeking a penalty pursuant to 29 U.S.C. § 1132(c), the court would decline to impose such a penalty given that any failures were substantially related to Plaintiff's tenure as Plan Administrator.

notwithstanding Employer's belief that the Board had only authorized a 65% maximum pension in 1994, and its vote in 2007 to return to a 65% level, Employer has actually ratified a 70% maximum benefit with an effective date of October 1, 1997, and incorporated that benefit in the Plan. (Exh. 433 at 2). At any rate, Employer and the Plan now concede that the accrued benefit limit at the time of Plaintiff's retirement was in fact 70%. The court infers from the evidence, however, that Plaintiff has been paid benefits based on the lower 65% figure.[11] ((Pl. Exh. 57; Tr. at Pp. 317-320). As such, Plaintiff has shown a violation of the anti-cutback rule.

If, in fact, Plaintiff's pension has been based on the 65% figure, he may be entitled to judgment on his claim for benefits under 29 U.S.C. § 1132(a)(1). His benefit should have been derived from a 70% maximum, with appropriate reductions for early retirement and election of a surviving spouse benefit, rather a 65% maximum. If so, Plaintiff is entitled to recover the difference between these two figures with respect to any payments received to date, and he is entitled to a declaration that his future payments should be based on the 70% formula rather than the 65% formula. The court is unable to state precise amounts, given that it depends upon a number of factors or variables, including the amount of Plaintiff's average compensation, the appropriate reduction for early retirement, and the appropriate reduction for election of a surviving spouse benefit. The court will direct the parties to confer with respect to calculation

---

[11] This would appear to be a matter of arithmetic on which the parties should be able to agree. If the court has misapprehended the evidence on this point, the Plan can file a motion for reconsideration.

of the appropriate monthly benefit under the court's findings, and to file a joint statement with respect thereto within 30 days of the date of this order.

The court has discretion to include prejudgment interest in the award. The court must determine whether prejudgment interest would serve to compensate the injured party and whether the equities of the case preclude an award of such interest. <u>Caldwell v. Life Ins. Co. of North America</u>, 287 F.3d 1276, 1286 (10th Cir. 2002). Under the unusual circumstances of this case, the court concludes that the equities preclude such an award for Plaintiff. Plaintiff's unauthorized amendments of the Plan show a lack of good faith on his part. The court concludes that prejudgment interest should not be included on an award of benefits, if due.

<u>Attorney's Fees and Costs</u>. Plaintiff also seeks an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132. (Doc. 55 at 29). Under § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." Plaintiff may have satisfied at least one prerequisite for such an award – he may have obtained "some degree of success on the merits." <u>See</u> <u>Hardt v. Reliance Standard Life Ins. Co</u>., 560 U.S. 242 (2010). But the Tenth Circuit considers other factors as well: (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties'

positions. <u>Cardoza v. United of Omaha Life Ins. Co.</u>, 708 F.3d 1196, 1207 (10th Cir. 2013). The evidence showed there was substantial confusion about the terms of the Plan as a result of Plaintiff's unauthorized actions and his failure to seek Board approval (or even inform the Board) regarding pension increases. That was clearly a factor in Employer's struggle to determine what had been properly authorized. As the author of this confusion, the equities do not favor an award of attorney's fees in Plaintiff's favor, despite any partial success on the claim for benefits.

**B. Counterclaims**.

Employer, which has been the Plan Administrator since 2007, asserts three ERISA counterclaims against Plaintiff: (1) breach of fiduciary duty; (2) engaging in prohibited transactions; and (3) equitable reformation.[12]

1. <u>Breach of Fiduciary Duty</u>. Employer contends Plaintiff breached fiduciary duties by "attempting to surreptitiously" amend the Plan in 1997 without disclosing that amendment to the Board and without obtaining Board approval for it. It alleges Plaintiff further breached a fiduciary duty by failing to file timely reports with governmental agencies, thereby causing Employer to incur increased fees, penalties and expenses.

Aside from denying any breach, Plaintiff asserts various defenses to these claims including the statute of limitations, ratification, estoppel, failure to mitigate, and laches. (Doc. 55 at 25).

---

[12] The Plan is also a counterclaimant but its standing is disputed by Plaintiff. Employer's standing to assert the counterclaims is undisputed. The issue makes no practical difference since Employer is asserting the claims on behalf of the Plan.

The court concludes Employer's counterclaims are not barred by the statute of limitations. Pursuant to the "except clause" of 29 U.S.C. § 1113, an action for breach of fiduciary duty "in the case of fraud or concealment" may be commenced not later than six years after the date of discovery of such breach or violation. The evidence showed that Plaintiff concealed his unauthorized amendments purporting to increase benefits. He did so with an improper intent to keep material facts from the Board when he had a duty to report them. He likewise concealed from Employer his failure to file and maintain reports and papers relating to the Plan and the costs and detriments resulting therefrom. Because of Plaintiff's concealment, Employer did not realize until late 2006 or 2007 (after it acquired the services of DeMars) the circumstances and import of his actions. The court concludes that Employer's claims for breach of fiduciary duty are subject to a 6-year limitations period under §1113 and that they were filed within the applicable period. The court further rejects Plaintiff's defenses of ratification, waiver, estoppel and the like. Plaintiff intentionally concealed his actions from the Board; he cannot now claim a benefit from having successfully done so. Once Employer realized the material facts, it acted with reasonable diligence is pursuing its claim. It did not ratify Plaintiff's actions and is not precluded from asserting its claim.

With respect to the merits of the counterclaims, the court finds that Plaintiff breached a fiduciary duty under ERISA by failing to administer the Plan in accordance with its terms and by failing to discharge his duties with the care, skill, prudence and diligence that a prudent man would use in like circumstances. See 29 U.S.C. §

1104(a)(1). Plaintiff's 1997 amendment increasing pension benefits was contrary to the terms of the Plan. Notwithstanding Plaintiff's asserted explanation that he was only trying to help the employees, by purposely concealing the matter from the Board and promising unauthorized benefits he in fact contributed to the Plan's serious underfunding problems and put the benefits of present and future retirees at risk. His actions caused the Plan to incur increased PBGC variable premiums and to pay out benefits to Plaintiff that were not authorized by the Plan terms. When combined with his failure to ensure that required DOL and PBGC forms were filed – which was itself a failure to discharge his duties with the required degree of care – his actions resulted in harm to the Plan in the form of unnecessary additional penalties and costs.

Under 29 U.S.C. § 1109(a), a fiduciary who breaches any of the responsibilities imposed on him by ERISA "shall be personally liable to make good to such plan any losses to the plan resulting from such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate...."

Based on the evidence presented, the court concludes Plaintiff's breaches of fiduciary duty render him liable to make good some of the Plan's losses. Due to underfunding and related problems, the Plan incurred PBGC variable premiums, penalties and interest of about $37,000 between 1998 and 2006. Not all of the underfunding resulted from Plaintiff's unauthorized actions, however. A significant portion resulted from other factors beyond Plaintiff's control such as

investment returns and employment decisions. Considering the totality of evidence, the court concludes that 50% of the foregoing amount, or $18,500, represents loss fairly attributable to Plaintiff's breach of duty. The unauthorized 1997 amendment also caused the Plan to pay out benefits to Plaintiff that were not due under the terms of the Plan. Employer presented testimony that this amounted to $10,147. The court concludes Plaintiff is likewise responsible for this Plan loss. Finally, the Plan incurred penalties and fees for other matters, such as the failure to timely file 5500's and other forms; these failures resulted in total costs and penalties of $11,420. The court concludes these losses also resulted from Plaintiff's breach. In sum, court finds Plaintiff is liable to make good a total of $40,067 in loss to the Plan resulting from his breaches of fiduciary duty.

2. <u>Prohibited Transactions</u>. Employer also contends Plaintiff engaged in transactions prohibited by ERISA. It argues that Plaintiff's administration of the Plan as though the 1997 amendment were valid constituted a use of plan assets for his own benefit, contrary to 29 U.S.C. § 1106(b)(1). The court agrees. While Plaintiff cannot be blamed having a potential conflict of interest from being both the Administrator and a Plan participant – Employer, after all, appointed him to the position – his use of the position to amend the Plan without Board approval and to pay out unauthorized benefits to himself constituted a use of Plan assets in his own interest. The court finds the loss resulting from this action is the same $10,147 in extra benefits mentioned previously. As such it does not increase his liability beyond the amount owing for breach of fiduciary duty.

3. <u>Equitable Reformation</u>. Employer and the Plan ask the court to

declare the 1997 Plan amendment invalid and to "equitably reform the Plan by approving the 2007 corrective Plan amendment as authorized by the Employer's Executive Board." (Doc. 55 at 24).

ERISA allows a fiduciary to seek certain types of equitable relief, including relief to redress ERISA violations or to enforce the Act or the terms of the plan. 29 U.S.C. §1132(a)(3). Assuming this authorizes the court to reform an ERISA plan or to make a declaration regarding the trust terms, cf. Amara, 131 S.Ct. 1866, the court declines to do so here. Plan participants other than Plaintiff are not parties to this action and the court will make no declaration pertaining to their rights. As the court previously indicated, Plaintiff's rights under the Plan are not necessarily the same as the rights of other participants. Other participants might claim an entitlement to benefits under a theory that Employer clothed Plaintiff with apparent authority to adopt the 1997 amendment. See Overnite Transp. Co. v. Highway, City & Air Freight Drivers Local Union No. 600, 105 F.3d 1241, 1246 (8th Cir. 1997) (under federal common law, a party asserting apparent agency must prove a manifestation by a principal to a third party that reasonably leads a third party to believe that another person is acting as the principal's agent). The court expresses no opinion here whether such a claim could succeed. But because the relief requested could effect the rights of participants whose interests are not represented here, the court concludes the request to reform the Plan should be denied. See 76 Am.Jur.2d, Trusts §612 (whether the beneficiaries of a trust are necessary parties may depend on the terms of the trust and the effect of the suit on their equitable interests).

<u>Attorney's Fees and Costs</u>.

The standards for awarding attorney's fees and costs under 29 U.S.C. § 1132 were set forth previously. Under those standards the court concludes that counterclaimaints' request for attorney's fees and costs should be denied. It is true that Plaintiff's actions gave rise to this lawsuit, and the evidence shows a lack of good faith on his part in amending the Plan. Without excusing that conduct in any way, the court cannot help but observe that had Employer and the Board exercised its oversight authority with any degree of energy it probably would have discovered these problems long ago, and the need or amount of attorney's fees involved would have been a fraction of what they are now. Employer had a responsibility under the Plan to "periodically review the performance of any Fiduciary...." Given the parties' respective roles, responsibilities and actions, as well as all of the other circumstances, the court concludes that each party should bear its own attorney's fees and costs in the matter.

## III. Conclusion.

Plaintiff is entitled to receive future benefits based on the stipulated maximum benefit of 70% of pay (with appropriate reductions for his elections). For past benefits he may be entitled to recover the difference between this 70% benefit and the benefits he has actually received. The parties are directed to submit a joint statement within 30 days of this order setting forth the amount of benefits due under the court's findings. The court will enter final judgment after receipt of the joint statement.

-48-

Employer and the Plan are entitled to recover from Plaintiff the sum of $40,067 for Plaintiff's breach of fiduciary duties and engagement in prohibited transactions.

Each parties' claims for attorney's fees and costs are denied.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 5 double-spaced pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp, 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 5 double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this 28th day of August 2013, at Wichita, Kansas.

s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE